No. 25-1746

# United States Court of Appeals
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

CAREY ALICE HERNANDEZ,
DEFENDANT-APPELLANT

*On Appeal from the United States District Court
for the Southern District of California
22CR0145-JO*

**ANSWERING BRIEF FOR THE UNITED STATES**

ADAM GORDON
*United States Attorney*

DANIEL E. ZIPP
*Assistant U.S. Attorney*
*Chief, Appellate Section*
*Criminal Division*

MARK R. REHE
*Assistant U.S. Attorney*

*880 Front St., Rm. 6293*
*San Diego, CA 92101*
*(619) 546-7986*

**TABLE OF CONTENTS**

Page

| | |
|---|---|
| Jurisdiction and Bail Status | 1 |
| Questions Presented | 2 |
| Statement of Facts | 2 |
| A. Hernandez's Personal Background | 2 |
| B. The Prelude to the Crimes: an Intended Sale of ORW Threatens to Expose Serious Cash Shortfalls During Hernandez's Tenure as Company Controller | 3 |
| C. The Arson Offense Conduct | 8 |
| D. The Ensuing Cover-Up and Attempted Witness Tampering Offense Conduct | 14 |
| E. The False Statement Offense Conduct | 19 |
| F. Prosecution, Trial, and Sentence | 22 |
| Summary of Argument | 27 |
| Argument | 30 |
| A. The Claim That Trial Counsel Was Ineffective for Not Moving to Suppress Some of Hernandez's Statements Is Not Cognizable on Direct Appeal; Alternatively, the Claim Fails on Its Merits | 30 |
| 1. Standard of Review | 30 |
| 2. This Claim Is Not Cognizable on Direct Review | 31 |
| 3. Even If This Court Reaches the Claim Now, Hernandez Cannot Meet Her Heavy Burden of Proving Ineffective Assistance | 32 |
| a. Counsel's Failure to Argue That Hernandez Was "in Custody" for *Miranda* Purposes Was Not Unreasonable | 33 |
| b. Counsel's Failure to Argue That the Statements Were Involuntary Was Also Not Unreasonable | 41 |
| c. There Was No Prejudice, Since Even a Winning Motion Would Not Have Affected the Verdicts | 42 |
| B. The Court Properly Admitted Testimony That $744,000 Went Missing from the Bank Accounts of ORW, During Hernandez's Tenure as Company Controller, as Motive Evidence for the Arson Under Rule 404(b) | 44 |

i

    1.   Standard of Review     44

    2.   Guiding Legal Principles     44

    3.   The Missing $744,000 Fell Squarely Within Rule 404(b) as Probative "Motive" Evidence     44

    4.   The Evidence Did Not Violate Rule 403     47

    5.   Any Error Was Harmless     49

C.   Sufficient Evidence Supported the Convictions for Attempted Witness Tampering     51

    1.   Standard of Review     51

    2.   This Claim Is Waived     51

    3.   This Claim Fails on Its Merits     52

        a.   Guiding Legal Principles     52

        b.   The Evidence of a Federal Nexus Sufficed     53

D.   The Court Did Not Plainly Err by Somehow Failing to Adequately Explain the 70-Month Sentence     55

    1.   Standard of Review     55

    2.   The Court Clearly Explained the Basis for Its 10-Month Upward Variance     56

    3.   The Court's Failure to Expressly Address Two Points in Mitigation Was Not Plain Error     58

    4.   Hernandez Also Cannot Satisfy the Last Two Prongs of Plain Error Review     59

Conclusion     60

Certificate of Compliance

**TABLE OF AUTHORITIES**

Cases:

*Bruce v. Warden Lewisburg USP,*
  868 F.3d 170 (3rd Cir. 2017)     53

*Fowler v. United States,*
  563 U.S. 668 (2011)     52, 54

*Gall v. United States,*
  552 U.S. 38 (2007)     57

*Gonpo v. Sonam's Stonewalls & Art, LLC,*
  41 F.4th 1 (1st Cir. 2022)     48

*Henry v. Kernan,*
  197 F.3d 1021 (9th Cir. 1999) ..... 41
*Jackson v. Virginia,*
  443 U.S. 307 (1979) ..... 51
*Lowry v. Lewis,*
  21 F.3d 344 (9th Cir. 1994) ..... 33, 42
*Petrocelli v. Baker,*
  869 F.3d 710 (9th Cir. 2017) ..... 40
*Premo v. Moore,*
  562 U.S. 115 (2011) ..... 33, 40
*Ramirez v. City of Buena Park,*
  560 F.3d 1012 (9th Cir. 2009) ..... 51
*Riley v. California,*
  573 U.S. 373 (2014) ..... 34
*Smith v. Ylst,*
  826 F.2d 872 (9th Cir. 1987) ..... 30
*Stansbury v. California,*
  511 U.S. 318 (1994) ..... 36, 37
*Strickland v. Washington,*
  466 U.S. 668 (1984) ..... 32-33
*United States v. Alferahin,*
  433 F.3d 1148 (9th Cir. 2006) ..... 32
*United States v. Arambula-Ruiz,*
  987 F.2d 599 (9th Cir. 1993) ..... 49
*United States v. Ayala-Nicanor,*
  659 F.3d 744 (9th Cir. 2011) ..... 55
*United States v. Bassignani,*
  575 F.3d 879 (9th Cir. 2009) ..... 34, 35, 37, 38, 40, 43
*United States v. Blitz,*
  151 F.3d 1002 (9th Cir. 1998) ..... 44
*United States v. Carter,*
  560 F.3d 1107 (9th Cir. 2009) ..... 58
*United States v. Carty,*
  520 F.3d 984 (9th Cir. 2008) (en banc) ..... 58
*United States v. Crawford,*
  372 F.3d 1048 (9th Cir. 2004) (en banc) ..... 39

*United States v. Dallman,*
  533 F.3d 755 (9th Cir. 2008) .......................................... 59
*United States v. Gomez-Norena,*
  908 F.2d 497 (9th Cir. 1990) .......................................... 55
*United States v. Haswood,*
  350 F.3d 1024 (9th Cir. 2003) ......................................... 42
*United States v. Hinkson,*
  585 F.3d 1247 (9th Cir. 2009) (en banc) ......................... 46
*United States v. Johnson,*
  132 F.3d 1279 (9th Cir. 1997) ......................................... 46
*United States v. Johnson,*
  874 F.3d 1078 (9th Cir. 2017) ......................................... 52
*United States v. Kim,*
  292 F.3d 969 (9th Cir. 2002) ........................... 34, 35, 37, 40
*United States v. Leon Guerrero,*
  847 F.2d 1363 (9th Cir. 1988) ......................................... 41
*United States v. Mayweather,*
  634 F.3d 498 (9th Cir. 2010) .......................................... 31
*United States v. Mende,*
  43 F.3d 1298 (9th Cir. 1995) .......................................... 48
*United States v. McGowan,*
  668 F.3d 601 (9th Cir. 2012) .......................................... 30
*United States v. McManaman,*
  606 F.2d 919 (10th Cir. 1979) ......................................... 48
*United States v. McShane,*
  462 F.2d 5 (9th Cir. 1972) ............................................. 42
*United States v. Mora-Alcaraz,*
  986 F.3d 1151 (9th Cir. 2021) ......................................... 40
*United States v. Osorio-Arellanes,*
  112 F.4th 647 (9th Cir. 2024) ......................................... 32
*United States v. Phillips,*
  812 F.2d 1355 (11th Cir. 1987) (per curiam) ................. 34
*United States v. Ruiz,*
  167 F.4th 1024 (9th Cir. 2026) ....................................... 44
*United States v. Sheffler,*
  125 F.4th 814 (7th Cir. 2025) ......................................... 52

iv

*United States v. Smith,*
  723 F.3d 510 (4th Cir. 2013)    52
*United States v. Tingle,*
  658 F.2d 1332 (9th Cir. 1981)    42

Constitution and Statutes:

Sixth Amendment    30
18 U.S.C. § 844(i)    1, 22
18 U.S.C. § 1001(a)(2)    1
18 U.S.C. § 1512(b)(3)    1, 52
18 U.S.C. § 1512(g)(2)    52, 55
18 U.S.C. § 3231    1
18 U.S.C. § 3553    26, 27
18 U.S.C. § 3553(a)    22, 23, 25, 27, 55, 56
28 U.S.C. § 1291    1

Rules:

Fed. R. Crim. P. 29    51
Fed. R. Evid. 403    47, 48, 49
Fed. R. Evid. 404(b)    2, 28, 44, 47

Sentencing Guidelines:

USSG § 5G1.1(b)    22

Law Review Articles and Encyclopedias:

William E. Ringel, *Searches and Seizures, Arrests
  and Confessions* § 27:2 (2d ed. Mar. 2026)    34-35
C.J.S. *Arson* § 20 (Apr. 2026)    54

No. 25-1746

# United States Court of Appeals

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

PLAINTIFF-APPELLEE

*v.*

CAREY ALICE HERNANDEZ,

DEFENDANT-APPELLANT

*On Appeal from the United States District Court*
*for the Southern District of California*
*22CR0145-JO*

**JURISDICTION AND BAIL STATUS**

The district court had jurisdiction under 18 U.S.C. § 3231, as Hernandez was charged with arson affecting interstate commerce, 18 U.S.C. § 844(i); attempted witness tampering, 18 U.S.C. § 1512(b)(3); and false statements. 18 U.S.C. § 1001(a)(2). Supplemental Excerpts of Record (SER)-4-6. After convictions by jury on all counts, the court entered judgment in April 2025, imposing 70 months in prison and three years of supervised release. 1-Excerpts of Record (ER)-18-23. Hernandez timely appealed. 6-ER-1223. This Court has jurisdiction under 28 U.S.C. § 1291. Hernandez is still in custody, and her projected release date is March 17, 2029. Appellant's Opening Brief (AOB) 4.

1

## QUESTIONS PRESENTED

A.    Whether a claim that trial counsel was ineffective for not moving to suppress certain statements that Hernandez made prior to arrest (1) is not cognizable on direct appeal; and (2) fails on its merits regardless.

B.    Whether the court properly allowed evidence that $744,000 went missing from her employer's bank accounts during Hernandez's tenure as company controller under Rule of Evidence 404(b).

C.    Whether the government adduced sufficient evidence to support the attempted witness tampering convictions.

D.    Whether the court plainly erred at sentencing by allegedly failing to adequately explain the 70-month custodial sentence.

## STATEMENT OF FACTS

A.  Hernandez's Personal Background

Hernandez is now 49.  After growing up in Arizona, where her mother worked as a police officer in Tucson, she moved to San Diego. Presentence Report (PSR) 15, 16.  At 23, she began to abuse methamphetamine and incurred state convictions for false personation, grand theft, and DUI. PSR 14, 17.  She then turned things around by attaining an associate's degree in business; having a daughter; and securing steady employment at Off Road Warehouse (ORW), a chain that sells off-road vehicle parts. PSR 16, 17.  But as this case sadly reveals, the end of her time at ORW was marked by a stunning return to crime—literally burning an ORW store to the ground, then trying to cover that offense up.

2

B.  The Prelude to the Crimes: an Intended Sale of ORW
    Threatens to Expose Serious Cash Shortfalls During
    Hernandez's Tenure as Company Controller

ORW is a retail business with a considerable footprint in interstate commerce. The chain consists of four branch stores in San Diego and Riverside Counties and an "online distribution store." 4-ER-620-21. So, its annual sales are substantial. According to the trial testimony of Randy Weisser—ORW's owner at all times relevant to this case—the franchise is "a multimillion dollar business." 4-ER-634.

Moreover, many parts sold by ORW are imported into California from out-of-state. 3-ER-545-46 (one "significant supplier" is a German "shock absorber manufacturer"); 4-ER-621 (other suppliers are based in China, Kentucky, and Ohio). As Weisser also testified, then, interstate transactions are a "core" facet of ORW's business. 4-ER-621.

Weisser hired Hernandez to work at ORW in April 2013. 4-ER-638. She first served as head of human resources and assistant to the controller. *Id.* In those capacities, she primarily worked in ORW's corporate office, which is located on the second floor of the headquarters branch store in Kearny Mesa. 4-ER-620, 823. But when the controller was fired just four months later, Hernandez assumed that role herself; and in May 2017, she was also promoted (with a commensurate pay raise) to general manager, for which she had responsibility over all four of the ORW branch stores. 4-ER-641-44; 5-ER-1066.

3

However, even after that promotion, Hernandez still remained ORW's controller. 4-ER-644. And in that role, she was "exclusively responsible" for "monthly bank reconciliations," meaning she had to ensure that cash from all sales at ORW stores matched the cash deposited to ORW's bank accounts. 4-ER-696; 5-ER-1065; 4-ER-633 (Weisser: "Q: [W]ho was responsible for managing ORW's deposits to the banks? A: Ms. Hernandez.").

As it turned out, there were major deficiencies in these reconciliations, and they grew *worse* with each year of Hernandez's tenure as controller. Namely, from January 2015 to March 2019, ORW's accounts suffered a total cash shortfall of around $744,000. 4-ER-686-87.

Be that as it may, no one noticed; and that actually was not surprising. As more than one witness testified at trial, ORW had no formal policies or strict oversight for cash reconciliation or other bookkeeping. See, e.g., 4-ER-635 (Weisser: "Q: There are policies that govern how financial records are to be kept and maintained; correct? A: No."); 4-ER-653 (Weisser: unable to confirm whether the "tens of thousands of dollars of cash" from daily ORW sales were in fact put "into a safe" at end of each day); accord 4-ER-694 (forensic accountant who later audited ORW's books: no one at ORW could assure her that settled financial recordkeeping principles are "scrupulously followed each and every day" at the company).

Yet in fall 2018, all that threatened to change when a Richard Botello entered into an agreement to buy ORW from Weisser. See 4-ER-621-22.

4

Botello was entitled to review ORW's books and records as due diligence for the proposed transaction; and since Hernandez was general manager and controller of ORW, Weisser named her point person to facilitate that due diligence. 4-ER-622.

Weisser and Botello eventually agreed on a closing date of March 28, 2019. 3-ER-561. And at first, Hernandez did facilitate the due diligence. 4-ER-590-91. But soon, she made a dramatic change by covertly taking a series of deliberate—and elaborate—steps to torpedo the sale.

First, she created a fake lawsuit to scare Botello off. In January 2019, he got an email from a "San Diego Legal Justice Center" claiming to represent former ORW employee Trina Dykeman in a "sexual harassment, wrongful termination and wage violation case" against ORW that she had no "intention of settling." SER-17-18. After disclaiming liability, SER-20, Botello got another email from "San Diego Legal Justice Center" claiming they found "eight" more ORW employees with "wage/timecard/OT issues" that would yield a "staggering amount of back pay due." SER-19.

But in actuality, there was no such thing as "San Diego Legal Justice Center." 4-ER-615-16. Also, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) agents traced the emails sent from that bogus entity to the IP addresses of digital devices registered in Hernandez's name at her home and ORW work addresses. 4-ER-805-14. And while Dykeman was actually a former ORW employee, she testified at trial she never

asked a "San Diego Legal Justice Center" to sue on her behalf, 4-ER-616, and that her signature on a form sent to Botello was forged.  4-ER-617.

Next, in February 2019, Hernandez offered to buy ORW *herself* from Weisser. 4-ER-624.  She claimed she had the money to do so and could get favorable financing as a "woman-owned business." *Id*.  Weisser declined, as he already had signed an agreement granting Botello "exclusive rights to buy" ORW, and Botello already had financing in place.  4-ER-624-25. When Weisser told Hernandez that, she proposed a novel way to get him "out of the agreement"—by threatening an employee "walk out" if Botello took over, which could get Botello "to cancel the escrow thereby allowing her to purchase" ORW.  4-ER-625.  Weisser still did not bite.

By early March 2019, the pending sale had become an open secret to ORW employees.  4-ER-699-700.  And on March 7, 2019, Hernandez went on medical leave for stress.  PSR 6.  Later the *same* day, an email entitled "SAVE OUR ORW FAMILY!!!" was sent to ORW employees decrying the "sleazeballs trying to buy our company" as "liars" who will "sell[] us out;" claiming they would cut wages; and urging a "walk out" if the sale pro-ceeded, SER-24-25—the exact same poison pill that Hernandez proposed to Weisser just weeks earlier.  Attached to the email was a pledge not "to work for" Botello, followed by signatures of 30 purported employees unaccompanied by printed names.  SER-26.

The walk out email did not state who sent it. Though Hernandez denied sending it when Weisser confronted her on the phone, he told her, "'This is exactly what you threatened to do two weeks ago, and now it's happened.'" 4-ER-627.[1] Soon after, Weisser and Botello held after-hour meetings with employees at each ORW store to address the email. *Id.* The employees' unanimous response was to deny that they signed the email's attached pledge and to affirm their desire to keep working for Botello. *Id.* (Weisser: "[W]ith no exceptions, all the employees said, 'No, that is not our signatures.' 'No, we've never signed anything like this.' And further, 'Yes, we're more than willing to work for the new buyers.'"). Corroborating that, ORW employees of long tenure testified at trial that they didn't recognize *any* signature on the pledge. See, e.g., 5-ER-894.

On March 13, 2019, employee Anthony Vellone attended one of the walk out email meetings. 4-ER-701. Thereafter, he contacted Hernandez on her personal email to solicit her views on ORW's proposed new owners. SER-27-28. She replied that Botello and his team were "complete pieces of shit," but also noted, "I am a bitch who can fuck some shit up," and "I will continue to cause them grief and make sure you guys are taken care of until I'm off FMLA leave, then I will go out with a bang!!" SER-28.

---

[1] Not only was Weisser correct about that; and not only was the email sent the same day that Hernandez went on leave, the email revealed facts about her leave that only she would know. SER-25 (noting at one point that stress from the pending sale "put Carey in the hospital"). The record thus contains substantial evidence that Hernandez sent the email.

On March 23, 2019, Hernandez's situation became even more tenuous when Botello advised her by email that, should the purchase go forward, he was not intending to keep her on as an employee. SER-30. That only further stoked her ire towards him. *Id*. (in an email response, Hernandez suggests that Botello's position was discriminatory).

But in the end, Hernandez's concerted efforts to kill the sale worked. On March 27, 2019—the day before it was set to close—Botello canceled the sale. 4-ER-628. Given all that Hernandez did to tank it, Weisser was not surprised. *Id*.; 4-ER-629 ("There had been so many strange things going on in the company, it didn't really surprise me at all."); 4-ER-632 (noting the "'sham walk out'" and "'sham lawsuit'" threatened in Hernandez's emails as being among the "reasons why" Botello pulled out). But Weisser never advised any ORW employee—Hernandez included—that the deal was off. 4-ER-629 ("Q: [D]id you tell anyone else at [ORW] that the deal was not going through? A: No."). The stage was thus set for the conflagration that followed.

C.    The Arson Offense Conduct

At 1:28 a.m. on March 28, 2019, a fire at the Kearny Mesa ORW store was reported to 911. 4-ER-718. Initially, four engines of the San Diego Fire Department responded. 4-ER-722. But when they arrived, the fire was already so strong they could only take up defensive postures against the flames from outside the store, using water hoses, 4-ER-729-30, 735:

8



SER-32 (firefighters outside ORW store front, circled in red).



SER-33 (heavy flames on store roof).

9





SER-34-35 (firefighters surrounding the store).

As a result, the first captain on the scene announced a "second alarm," which brought an "additional four engines" and other trucks. 4-ER-729. The fire was finally contained "several hours" later. *Id.*

The fire ultimately caused over $3 million in damages. 4-ER-631. These before-and-after photos reveal the extent of the destruction:



SER-36 (salesroom before fire).



SER-37 (salesroom after fire).

11



SER-38 (garage before fire).





SER-39-40 (garage after fire).

Later the same day of the fire, an ATF National Response Team agreed to investigate at the request of local authorities. 4-ER-750.[2] Following a forensic review, investigators found that the fire was "intentional" and had two points of origin: the parts room, and the corporate office— where Hernandez worked. 4-ER-759-60, 775-76.

It did not take long for Hernandez to come under suspicion. Not only did she work in an area where the fire was started, a truck fitting the description of one she owned—a Toyota 4Runner with dark rims that she bought for her daughter Isabella (who was 16 then and went by "Belle"), 2-ER-109, 116, 123-25; 5-ER-882—was seen on security camera footage parking at the Kearny Mesa ORW store just 15 minutes before the fire was called in to 911. 4-ER-789, 798. The footage also showed the driver— whose face could not be seen or identified, 4-ER-799—exiting the truck, entering the store, coming back out four or so minutes later, returning to the truck, then driving away. 4-ER-799-801; 5-ER-1105.

In turn, using security footage from other businesses along the route, investigators traced the same Toyota 4Runner with dark rims making a round trip to the ORW store and back from a point near Hernandez's

---

[2] As explained at trial, since ATF has always had "federal responsibility to investigate fires that affect interstate commerce," 4-ER-746, the agency created National Response Teams in 1978 as mobile units to investigate large fires and explosions where "local authorities are just overwhelmed by the scene, the scope, and need more resources." 4-ER-750.

residence between 1:01 and 1:30 a.m. that same morning. 4-ER-789-804. And consistent therewith, an ATF agent testified at trial that she was able to make that same round trip at a comparable early-morning hour (with little to no traffic) in just under 30 minutes. 4-ER-785-88.

### D. The Ensuing Cover-Up and Attempted Witness Tampering Offense Conduct

News that a Toyota 4Runner with dark rims was seen at the ORW store when the fire began spread quickly: Hernandez learned as much from coworkers later the same day of the fire. 2-ER-131. In response, Hernandez immediately undertook a series of deceptive acts to cover up her involvement in the arson.

On the morning of March 29, 2019—the day after the fire—she was seen on security footage parking her Toyota 4Runner at a San Diego American Automobile Association (AAA) office. 4-ER-833-34. After she then entered the office, she filed an application to replace the truck's license plates, one of which she claimed had been "stolen." 5-ER-862-63, 872-73; SER-41. That application was granted; and in short order, Hernandez left the AAA with new plates in hand. 5-ER-860, 875-76. Of note, when she then drove off at 9:17 a.m., security footage showed that her Toyota 4Runner was still sporting dark rims at that time:

14



4-ER-833.

Those rims bear noting because they, too, factored significantly into Hernandez's efforts to cover up her involvement in the arson. When she bought the truck for her daughter in 2017, it still had the silver "stock" factory rims. 2-ER-120; 4-ER-707. Soon after, Hernandez replaced them with dark aftermarket rims. 4-ER-707. This April 2018 photo reflects those dark rims:



SER-42.

15

That said, a half hour after leaving the AAA in the Toyota 4Runner still bearing dark rims on March 29, 2019, Hernandez did something odd. In rapid succession, she messaged three ORW mechanics with whom she was close—on a platform (WhatsApp) she never used with them before, which claims to be "secured with end-to-end encryption"—and asked all three if they "remember[ed]" switching the truck's rims back to the *silver* stock ones a "month ago," for "Belle," during their "lunch" break. See 4-ER-706-10; 5-ER-880-84, 897-903; SER-43-45.

The first mechanic that Hernandez messaged thus was Sergio Lopez:



SER-43. At trial, Lopez testified that he never switched back the rims, as Hernandez was trying to suggest, 5-ER-883; and that before sending these messages, Hernandez first sent him a standard text asking if he

16

had WhatsApp (to which he said yes). 5-ER-880. He also said that he had known Hernandez "a long time," and she "treated [him] well." 5-ER-884. Despite that, he never replied to her WhatsApp messages. 5-ER-886.

The next mechanic that Hernandez messaged just five minutes later was Douglas Ebba, whom she affectionately called "Douggy," 5-ER-900:



SER-44. At trial, Ebba testified that he was "surprised" to receive these messages, as Hernandez had never before contacted him on WhatsApp. 5-ER-898. And like Lopez, Ebba said he never switched back the rims on the Toyota 4Runner, or know any ORW employee who did. 5-ER-902, 903. Ebba also testified that—contrary to what Hernandez was suggesting in her message—he had never seen the truck with stock rims "at any point before the fire." 5-ER-902-03. So, besides saying "not sure," Ebba made no further reply to Hernandez on this WhatsApp thread. 5-ER-907.

17

The last mechanic that Hernandez then messaged two hours later was Vellone, who was already discussed earlier regarding the walk out email:



SER-45. At trial, Vellone testified that he did not switch the rims back to silver stock ones a month before the fire, nor did he know of any ORW employee who did. 4-ER-709. He also testified that he viewed Hernandez as "a mentor and someone [with whom] he was close." 4-ER-710.

After all these efforts to create an alibi of sorts for her Toyota 4Runner, Hernandez then wasted no time changing its rims back to silver stock ones *herself*—and *not* at ORW. On either the same day of her WhatsApp messages to Lopez, Ebba, and Vellone (March 29, 2019) or the day after (March 30),[3] she took the truck to a Performance Team Tires & Wheels and paid them $600 "to put the stock ones back on." 2-ER-170-72.

---

[3] When later asked, Hernandez could not remember exactly which of the two days it was, but indicated it had to be one of them. See 2-ER-172.

18

E.   The False Statement Offense Conduct

On March 31, 2019—just three days after the fire, and a day or two after Hernandez changed her truck's rims—agents of ATF's National Response Team interviewed ORW employees at the San Diego ATF office. 4-ER-821-22; 5-ER-869. Hernandez talked with an Agent Gistinger, who was assisted by a San Diego Police Department detective. 4-ER-821. As Agent Gistinger noted at trial, it was a "very casual interview" wherein he "introduced" himself, then discussed Hernandez's duties at ORW and any cars she owned. 4-ER-822-23. At the outset, Hernandez was told that she was free to "terminate the interview" and "leave" any time, 5-ER-866; and she was also told "it was a crime to lie to federal agents." 4-ER-822. Thereafter, she confirmed she was "in charge of the financial aspects" of ORW as the "general manager" and "comptroller" for "all" branch stores; and she admitted to owning a "Toyota 4Runner." 4-ER-823.

On April 4, 2019, Agent Gistinger called Hernandez to ask if she was available to come to the burnt premises of the Kearny Mesa ORW store for a second interview. 5-ER-920-21, 928. She agreed to meet. 5-ER-921. When she arrived, she was greeted by Agent Gistinger and another ATF officer, Agent Beals, who said he "really appreciate[d]" her taking the time to talk again. 2-ER-40. For two-and-a-half hours, the group then walked around areas of the store while agents mostly asked Hernandez about mundane details, including the "prefire conditions of the building, where employees parked, different doors [she] would use to enter or exit

19

the building during work, where different things were stored inside the building and at what time, her most recent visits to the building, [and] vehicles that she drove." 5-ER-922; see 2-ER-40-123; see also 5-ER-936 (Agent Beals: it was a "'walk-and-talk'-type interview").

But halfway through that interview, Hernandez told an outright lie. When asked if she recently had work done to the Toyota 4Runner (which she again said she owned, though it was her "daughter's car," 2-ER-109), Hernandez claimed—repeatedly—that the rims were "switched" back to silver stock ones at the Kearny Mesa ORW store a "couple months ago." 2-ER-111-13. The agents knew that was a lie, as they were already in possession of the AAA security footage from just days earlier still showing the truck with dark rims. 4-ER-833. Hernandez also repeatedly claimed her daughter was the impetus for the rim change, as she supposedly did not like the dark ones. See, e.g., 2-ER-111 ("They switched the wheels at that point because she always hated the wheels."); 2-ER-116 ("She is a 16-year-old girl. . . . So, like, cool rims are not where she is at.").

Accordingly, the agents challenged Hernandez on her lie at that point. 2-ER-123. First, they showed her a take from the security footage at the time of the fire that reflected a Toyota 4Runner with dark rims parked at the ORW store; Hernandez denied that truck was hers. 2-ER-123-25. Then, they showed her a take from the AAA security footage the next day, which also reflected a Toyota 4Runner with dark rims; Hernandez

20

again denied the truck shown was hers. 2-ER-126-28. It was only after agents said that they knew for a fact the rims were recently changed that she finally admitted lying. 2-ER-128-29. (And minutes later, she spelled out that she herself had the rims changed days earlier at a different store. 2-ER-170-72.) Worse yet, Hernandez also admitted advising her *daughter* to tell authorities the same lie if asked. 2-ER-156-57 ("Q: Have you ever told your daughter what to say? A: About . . . when we changed the rims? Q: Yeah. What did you tell her? A: To say it was a month ago.").[4]

Despite catching Hernandez in a lie, agents stated they had no desire to arrest her for that, since they just wanted more information on the fire. 2-ER-142 (Agent Gistinger: "I can arrest you now for a federal felony. . . . That is not where we are going with this thing. . . . We are trying to get your assistance in this thing. But we want you to be truthful with us."). Yet Hernandez never did admit setting the fire; she vehemently denied it and insisted someone set her up. See, e.g., 2-ER-134 ("Q: Did you set the fire? A: No, no, no, no, no, no, no. I would not do this."); *id.* ("I . . . think that someone is fucking with me bad."); *id.* ("[M]y daughter, my husband, and myself would never do this.").

---

[4] As it turned out, a search warrant was being executed at Hernandez's home at the same time of her meetup with Agents Beals and Gistinger, 2-ER-145; her daughter was encountered at the home with her boyfriend and questioned by other ATF agents, SER-11; and when asked about the truck rims, the daughter *did* repeat the lie that they "were changed about a month ago (around the beginning of March 2019)." SER-13.

F.    Prosecution, Trial, and Sentence

Hernandez was allowed to go home after the interview.  2-ER-189-91. When the other ATF agents finished executing the search warrant there after she arrived, they found $40-45,000 in cash in a safe.  PSR 10.

It was not until nearly three years later that Hernandez was arrested in this case, PSR 2, then ultimately charged with arson affecting commerce; attempted witness tampering; and making false statements. SER-4-6.  At a jury trial, she was convicted of all charges.  6-ER-1231-32.

For sentencing, the parties agreed that the Guideline range was 60-60 months—the arson mandatory minimum, 18 U.S.C. § 844(i)[5]—and each party requested 60 months in the sentencing filings.  2-ER-267; SER-58. At an initial sentencing hearing, the court heard from the parties on the 18 U.S.C. § 3553(a) factors. Not surprisingly, prosecutors emphasized the many aggravating ones, including the scope of the fire, 6-ER-1163 (it was "an inferno"); the threat it posed to nearby businesses, one of which was an animal hospital, *id.* ("[b]ut for the heroic efforts of the firefighters, this could have been much worse"); Hernandez's premeditation, 6-ER-1164 ("[T]his wasn't some impulsive act.  This was planned out."); her many subterfuges to prevent the sale of ORW and cover up her role in the arson, *id.* ("There is the fake law firm that she created using a real person's

---

[5] Initially, the Guideline range was 41-51 months.  PSR 19.  But since the statutorily required 60-month minimum exceeded that range's high end, 60-60 months became the Guideline range under USSG § 5G1.1(b).  *Id.*

22

information to create a fake lawsuit to scuttle the deal. There is the fake petition related to . . . the workers walking out that was tied back to her. There are the text messages she sent to her friends to trick them into helping her get away with the arson."); the fact she showed no remorse, *id.* ("she has never accepted responsibility for any one of these things"); and the fact that the fire victimized not only Weisser as ORW's owner, but also many mechanics who lost valuable tools in the blaze. 6-ER-1165.

To that last point, Weisser himself appeared and gave a compelling impact statement. 6-ER-1166 ("[O]ther than losing family, loved ones, this is without a doubt the most serious, horrific thing that's ever happened to me in my lifetime."); 6-ER-1170 ("[I]nstead of having a business that was sold that was going to give me some cash [and] make our family a little more comfortable . . . I had the worst of everything. Now, I've got a business that's been disabled. Our [Kearny Mesa] store generated the most revenue; burned to the ground."); 6-ER-1172 ("[A]pparently I was much, much angrier . . . than I realized. It got to the point [that] my wife . . . basically stated I needed to go to therapy, which I did. And I went for six months, and I was helped in how to deal with this.").

Defense counsel had little of substance to say on 18 U.S.C. § 3553(a) factors. Since an appeal was forthcoming, she chose to "focus on not the nature and characteristics of the offense," but on who Hernandez "is as a person outside this event." 6-ER-1174. So, besides briefly acknowledging

23

this was "an extremely serious offense," 6-ER-1160, counsel noted that Hernandez had "suffered numerous medical issues" from chronic seizures while in custody, *id.*, but was getting good care, 6-ER-1161; had "only one prior over 20 years old," *id.* (though three convictions resulted from that offense conduct, PSR 14); and she had done more "community service" than any of counsel's other clients. 6-ER-1162.

Similarly, in her allocution, Hernandez made *no* mention of the fire or its victims. Instead, she spoke only of her pride as a mother, 6-ER-1176 ("I'm a mother who's raised an incredible, kind, confident, selfless, loving human being."), and her community service. *Id.* ("I'm a woman who is passionate about the people society has forgotten or pushed aside."). As for her seizures, she confirmed she was getting good care, and even she said they were not a paramount sentencing concern. 6-ER-1177 ("I now have painful seizures, but they always make for interesting stories. I've had multiple head and limb injuries, but I've met a ton of wonderful people in the medical department in the hospital. So, my answer really is: my health issues are not what are important here"); accord 2-ER-285-315 (medical records reflect consistent treatment for the seizures).

Instead of imposing sentence then, the court said it was considering an upward variance based on the fact that Hernandez also told her teenage daughter to lie about when the rims of the Toyota 4Runner were changed. 6-ER-1158 ("[E]specially concerning to the Court . . . is when [she] asked

24

her daughter to lie for her. . . . [T]hat's conduct that a mother, instead of protecting her, asked her to do something that could have gotten the daughter independently into a lot of trouble and really had an impact on the course of her life."). As the court noted, since there was no "specific offense characteristic" for such conduct, *id.*, a "variance might be appropriate because it's not already captured in the [Guideline] calculations." 6-ER-1159. The court continued sentencing two weeks to give "everyone . . . a chance to respond." 6-ER-1178.

The parties then filed briefs. In hers, Hernandez now claimed she never told her daughter to lie about the rims to *the police*, SER-80—even though that was the clear import of what she admitted in her second ATF interview, 2-ER-156-57; and an official report confirmed the daughter *did* falsely tell other ATF agents when her home was being searched that the rims were changed a month before the fire. SER-13. So, in their brief, prosecutors claimed Hernandez's position was not "credible." SER-85.

When the parties reconvened, the court expressly found Hernandez did specifically tell her daughter "to lie to agents." 6-ER-1189. The court then imposed sentence. After finding a 60-60 month Guideline range, 6-ER-1190-91, the court analyzed the 18 U.S.C. § 3553(a) factors thus:

> [B]ased on the trial testimony [and] victim statements, . . . this [arson] was a very serious crime, a dangerous crime, it's located next to an animal shelter, based on the trial evidence. It was a destructive behavior that was done intentionally and done as a pattern of covering up missing money. Whether [Hernandez]

25

was the one that actually took the money or in an attempt to cover up the missing money, . . . it was part of a very intentional series of actions resulting in this wanton and deliberate and destructive course of action that destroyed a business, that destroyed a building, that put firefighters' lives at risk, that put at risk the buildings and the animals in the animal shelter next to it. So the nature of the crime here is serious. The Court considers it very serious, very egregious, very destructive.

When it comes to the defendant's personal characteristics, the Court does note her lack of criminal history. And despite her father dying at a young age, . . . she notes that she had a good childhood, and I don't see any information about any significant trauma or abuse . . . or neglect in that background there.

The Court has considered her allocution and . . . personal characteristics, considered the seriousness of the crime here, as well as the other 3553 factors, and the Court finds that . . . the Guideline range . . . of 60 to 60 months based on the mandatory minimum reflects that balance of 3553 considerations.

However, what is not reflected in this analysis so far and . . . in this Guideline calculation is the further egregiousness of not only trying to obstruct justice, not only trying to—for setting fire to this building in breach of the trust of a gentleman who has been your boss and placed a lot of trust in you over a great period of time, in addition to that, we have behavior that . . . is not just— not only obstruction of justice, not only attempts to cover up, but the egregiousness of then putting your own daughter in danger by asking her to lie to law enforcement.

6-ER-1191-92. So, finding that an upward variance was indeed merited, the court imposed a custodial term of 70 months. 6-ER-1193.

Moments later, after advising Hernandez of the conditions of a three-year term of supervised release, the court provided this further analysis:

26

The Court's going to circle back a little bit and note something additional that it neglected to note as part of the 3553 balancing here, which is that the destruction, the greatest part of the loss here was suffered by the owner of the business, but the intentional destruction here also fell on the shoulders of people who were coworkers of Ms. Hernandez who kept their personal tools in that business as well. So there was that victim harm [also] to be factored into the calculation.

6-ER-1195-96.

As the hearing drew to a close, defense counsel was given a chance to lodge objections. 6-ER-1197. She only stated this: "defense objects to the Court's sentence and specifically failure to consider all of the 3553(a) factors and the fact that the Court relied on trial testimony in departing upwards." *Id.* Counsel did not object to the adequacy of explanation for the sentence. In response, the court clarified that it did, in fact, "consider all of the 3553 factors. It did not mechanically go through and articulate its thinking on each and every one, it is not required to do so. It hit upon . . . some of the main factors in that analysis, but the entirety of the factors was considered in the decision." 6-ER-1199.

## SUMMARY OF ARGUMENT

A. The claim that counsel was ineffective for not moving to suppress Hernandez's statements at her second ATF interview fails on two bases. One, it is not cognizable on direct appeal: the record is not fully developed on counsel's reasoning, and there was no obvious error since suppression had low odds of success. Two, even if cognizable, it still fails on its merits.

27

Hernandez never notes as much, but she has to show that *no* competent lawyer could have believed a motion to suppress would have failed. She cannot, despite her claim that her counsel erred "so egregiously." AOB 1. Her argument now that she was in custody was a long shot at best: she agreed to the interview in a public place; custody-based *Miranda* claims rarely succeed outside stationhouse contexts; and most relevant factors would have militated strongly against a finding of custody. Her argument now that her statements were involuntary had even less hope of success: agents did not overpower her will; they treated her with consideration; and her claim that they threatened to prosecute her daughter is absurd. Yet even if this Court were to disagree with all the foregoing, there *still* is no reasonable probability the verdicts would have differed.

B. The court properly allowed testimony from a forensic accountant that $744,000 went missing from ORW's accounts, while Hernandez was company controller, under Rule of Evidence 404(b). As the court found, since the sale of ORW to Botello threatened to reveal this evidence of her gross financial mismanagement (which could expose her to criminal/civil liability, or affect her future employability) in the due diligence process, the missing cash gave her a strong motive to commit the charged arson. Further, this strong probative value was not substantially outweighed by any risk of unfair prejudice.

28

C.   Sufficient evidence supported the attempted witness tampering convictions.  Despite defense claims otherwise, prosecutors established a reasonable likelihood that the arson would be investigated federally by eliciting proof that: an ATF investigation was *already* underway at the time of the attempted tampering; the ATF has an established practice of helping local officials investigate arsons under the circumstances here; and this particular fire had a substantial effect on interstate commerce.

D.   The court did not plainly err by failing to adequately explain the 70-month sentence.  The court was *very* clear that the 10-month upward variance from the 60-60 month Guideline range was based on Hernandez telling her teenage daughter to also lie about when the rims on her truck were changed—egregious misconduct unaccounted for by the Guidelines. In turn, the court's failure to expressly discuss Hernandez's health issues and community service was not fatal.  Hernandez herself admitted her health was not a paramount sentencing concern, as she was getting good care in custody.  And her community service, while laudable, had nothing to do with this case—and was obviously outweighed by the aggravating facts of burning a multimillion dollar business to the ground, tampering with witnesses to cover that arson up, and lying to investigating agents. Thus, there is also no reason to disturb the sentence.

29

**ARGUMENT**

A.    The Claim That Trial Counsel Was Ineffective for Not Moving to Suppress Some of Hernandez's Statements Is Not Cognizable on Direct Appeal; Alternatively, the Claim Fails on Its Merits

Hernandez first claims trial counsel rendered ineffective assistance by not moving to suppress her statements from her second ATF interview. AOB 27-45. She now contends that she had two bases of suppression: (1) she was in custody but never *Mirandized*, AOB 32-37; and (2) her statements were involuntary. AOB 37-39. Neither contention has merit, and this claim is not even cognizable on direct appeal.

### 1.    Standard of Review

"As a 'general rule,' we 'do not review challenges to the effectiveness of defense counsel on direct appeal.'" *United States v. McGowan*, 668 F.3d 601, 605 (9th Cir. 2012) (citation omitted). "Challenge by way of a habeas proceeding is preferable because it permits the defendant to develop a record as to what counsel did, why it was done, and what, if any, prejudice resulted." *Id.* There are only two exceptions: "'(1) where the record on appeal is sufficiently developed to permit determination of the issue, or (2) where the legal representation is so inadequate that it obviously denies a defendant his Sixth Amendment right to counsel.'" *Id.* (citation omitted). If either of these exceptions apply, review is de novo. *Smith v. Ylst,* 826 F.2d 872, 875 (9th Cir. 1987).

30

### 2. This Claim Is Not Cognizable on Direct Review

Neither exception applies here. To start, the record is not sufficiently developed. While trial counsel did note at one point that he did not file a *Miranda* motion since he believed Hernandez was not in custody during her second ATF interview, 1-ER-4 n.2, the record says no more than that. It is silent on whether counsel ever discussed the issue with Hernandez; whether she concurred in not filing a *Miranda* motion; or whether she felt counsel's time was better spent on other efforts. Similarly, while counsel also once said he was mulling a "voluntariness" challenge, he had not read the full interview transcript at that point, 1-ER-3; he did not yet know which statements prosecutors planned to admit, *id.*; and he never raised the issue again. So, the record is again silent on his reasons for foregoing that challenge. *United States v. Mayweather*, 634 F.3d 498, 507 (9th Cir. 2010) (not reaching ineffective assistance claim on direct appeal, where record was silent on "what advice [counsel] gave Mayweather" and "why [he] did not file a suppression motion").

In turn, failing to file a motion to suppress was not obviously deficient. As will be argued next, a *Miranda* or voluntariness challenge had little to no chance of success. See pp. 33-42, *infra.* So, competent counsel could well have chosen not to pursue suppression and instead put his limited time to other uses.

31

In arguing otherwise as to both exceptions, Hernandez's reliance on *United States v. Osorio-Arellanes*, 112 F.4th 647 (9th Cir. 2024), and *United States v. Alferahin*, 433 F.3d 1148 (9th Cir. 2006), is misplaced. In both cases, counsel's alleged mistakes were already fully manifested since they were recorded on tape or by a court reporter. *Osorio-Arellanes*, 112 F.4th at 659 (counsel's bad advice that defendant admit his intent to rob drug smugglers was "fully reflected in the interrogation transcript"); *Alferahin*, 433 F.3d at 1161 n.6 (counsel's refusal of jury instruction on materiality element was "recorded clearly in the record" at sidebar). In both cases, the mistakes were also obvious. *Osorio-Arellanes*, 112 F.4th at 661 (counsel's belief that "robbing drug smugglers is not a crime" was a "blatant misunderstanding" of the law); *Alferahin*, 433 F.3d at 1157, 1161 (lawyer "had no idea [a materiality] instruction was available to his client as a matter of right," though materiality was "an element of the crime"). Little wonder, then, those cases reached the claims on direct appeal. But as this is *not* a case based on an isolated, recorded instance of manifestly bad advice, *Osorio-Arellanes* and *Alferahin* are inapposite.

### 3. Even If This Court Reaches the Claim Now, Hernandez Cannot Meet Her Heavy Burden of Proving Ineffective Assistance

To prove ineffective assistance, Hernandez must satisfy two prongs. One, she must show that counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688

32

(1984). As a general rule that is already a difficult standard, since courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. But in specific regard to claims based on the failure to file a suppression motion, the standard becomes even more difficult: Hernandez must show that "*no competent attorney would think a motion to suppress would have failed.*" *Premo v. Moore*, 562 U.S. 115, 124 (2011) (emphasis added).

Two, Hernandez must show prejudice. *Strickland*, 466 U.S. at 688. That is again a difficult standard. It is not enough to show that she had "nothing to lose" by filing a motion, or that a motion might possibly have prevailed; she must show a "reasonable probability" that a motion would have succeeded *and* that the trial result would have differed without the suppressed evidence. *Lowry v. Lewis*, 21 F.3d 344, 346-47 (9th Cir. 1994).

> a. Counsel's Failure to Argue That Hernandez Was "in Custody" for *Miranda* Purposes Was Not Unreasonable

Hernandez first faults trial counsel for not arguing that she was "in custody" during her second ATF interview, such that she should have been *Mirandized* at some point. AOB 32-37. But she cannot carry her heavy burden, since many a competent attorney could have concluded that this claim would have failed. *Premo*, 562 U.S. at 124.

As the first of two threshold observations, whether one is in custody during anything besides a stationhouse interrogation—the paradigmatic

33

context treated by *Miranda*—is not a binary question governed by simple blackletter law. Compare, e.g., *Riley v. California*, 573 U.S. 373 (2014) (warrantless search of phone incident to arrest is illegal). Instead, such cases are governed by a balancing test for which there are five recurring factors (none of which controls), that courts must consider along with any other relevant fact, in determining if "a 'reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave.'" *United States v. Bassignani*, 575 F.3d 879, 883 (9th Cir. 2009) (citation omitted). The five recurring factors are:

> (1) language used to summon the individual; (2) extent to which the defendant was confronted with evidence of guilt; (3) physical surroundings of the interrogation; (4) duration of the detention; and (5) degree of pressure applied to detain the individual.

*Id.* (citing *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002)). So, unlike the blackletter contexts noted earlier—where a motion to suppress can be assessed just by answering a yes-or-no question (e.g., was a phone searched incident to arrest sans warrant)—deciding whether to challenge a non-stationhouse interview as custodial under *Miranda* is a far more demanding task to begin with. *United States v. Phillips*, 812 F.2d 1355, 1359 (11th Cir. 1987) (per curiam) ("Precisely defining 'custody' for purposes of *Miranda* has [even] been somewhat troubling for the courts.").

As the other threshold observation, such *Miranda* challenges rarely succeed. See, e.g., William E. Ringel, *Searches and Seizures, Arrests and*

34

*Confessions* § 27:2 (2d ed. Mar. 2026) ("[L]ower courts have rarely found that an interrogation was custodial when . . . conducted outside a police station or police vehicle, for instance, in the suspect's home or office. [This] line of cases is premised on the lack of coerciveness in a familiar environment which renders the suspect less likely to be intimidated by police authority.").

That said, application of the five *Kim* factors here strongly suggested yet another invalid *Miranda* challenge based on a claim of custody.

First, the language used to summon Hernandez to the ORW store was not coercive. Agent Gistinger just called her up and asked, "more or less, 'Are you available to come over now?'" and she agreed. 5-ER-928. So, far from commanding, instructing, or ordering her to appear, *Bassignani*, 575 F.3d at 884, he respectfully asked if she was "available" to talk; she said she was; and she then drove to ORW on her own. As *Kim* itself held, such facts already strongly militate against a finding of custody. 292 F.3d at 974-75 ("If the police ask—not order—someone to speak to them and that person comes to [them], voluntarily, precisely to do so, the individual is likely to expect that he can end the encounter.").[6]

---

[6] Hernandez feels Agent Gistinger was "less-than cordial" since he asked, "'Are you available to come over *now*.'" AOB 37 (citing 5-ER-928). But no emphasis on "now" is noted in the transcript, nor is it evident in context. Regardless, there was an indisputable abundance of cordiality by agents once Hernandez arrived. 2-ER-40 ("Q: Thanks so much for coming over. I really appreciate you making time to— A: Yeah. Q: —come over and chat with us since— A: Of course. Q: It is much appreciated.").

Next, as for the extent to which the defendant was confronted with evidence of guilt, Hernandez was so confronted but not to a great extent. The confrontation did not occur until more than halfway through the interview; it only involved agents showing her two photos of what they said was her truck with dark rims at the ORW the night of the fire and at a AAA office the day after (and saying they had more video of the truck); Hernandez insisted the truck was not hers; and agents said they did not believe her. See 2-ER-123-42. Nothing in how that happened would have objectively indicated to Hernandez that she was now in custody. That is critical, as "[e]ven a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." *Stansbury v. California*, 511 U.S. 318, 325 (1994). While Hernandez was taken aback at seeing the first photo of her truck, Agent Beals immediately calmed her down by telling her to "take a breath;" and after replying, "I will take a breath," she continued answering questions without difficulty. 2-ER-128. Also, far from being aggressive, agents presented their photos and theories calmly and matter-of-factly, all while clarifying that they only wanted Hernandez to be aware of their position. See, e.g., 2-ER-130 ("Q: You see our side of the story? A: I see your side of the story."); 2-ER-132 ("Q: Do you understand we have been doing this for a long, long time? A: I get it[.]"); 2-ER-136 ("Q: So let's talk about the

36

totality of circumstances that we know. Okay? A: Okay."). Finally, while such exchanges should have made clear agents were far more interested in just discussing the case than instilling fear of arrest, Agent Gistinger even spelled that out at one point. 2-ER-142 (after telling Hernandez he could already "arrest [her] now for a federal felony" of lying to agents, stating that "is not where we are going with this" because "[w]e are trying to get your assistance"). Thus, even if the second *Kim* factor weighs in favor of Hernandez, it does not do so significantly.

Third, since the interview occurred in the "familiar surroundings" of Hernandez's workplace, that too militated against a finding of custody. *Bassignani*, 575 F.3d at 885. Disagreeing, Hernandez cites Agent Beals' testimony that he likes to interview suspects at arson scenes to see what "reaction that might elicit," 5-ER-922; and she claims she did indeed get upset "wading through the wreckage." AOB 36 (citing 2-ER-43). But the agent never conveyed his reason for choosing the site to Hernandez; and the law is clear that the issue of custody is not affected by the "subjective views harbored by . . . interrogating officers." *Stansbury*, 511 U.S. at 323.[7] And while Hernandez did say early on in the interview, "Oh, my God. Okay. So this is super upsetting," 2-ER-43, that is hardly the evidence of

---

[7]  Agent Beals did, however, tell Hernandez at the interview's start that she did *not* have to traverse any part of the premises she did not want to. 2-ER-40 ("Q: We will walk a little of the outside first. A: Okay. Sure. Q: And then we don't want you to do anything you're uncomfortable with. A: No."). That further undercuts her position on the third *Kim* factor.

severe distress she now suggests. Not only did she pivot to jokes on her drawing abilities just seconds after marking that remark, 2-ER-43-44 (referring to a map of the ORW store she drew for the agents), she showed no signs of distress thereafter and had no trouble continuing to discuss myriad details of the burnt premises. See 2-ER-44-123.[8]

Next, the interview went for two-and-a-half hours, which is "at the high end." *Bassignani*, 575 F.3d at 886. But even *Bassignani* found an interview of the same length did not compel a finding of custody. *Id.*

Last, as for the degree of pressure applied to detain Hernandez, there was none. She was never cuffed or restrained in any way. Instead, as Agent Beals testified, it was a casual "'walk-and-talk'-type interview" through what remained of the ORW store, 5-ER-936; agents voiced their "appreciat[ion]" to Hernandez as soon as she arrived, 2-ER-40;[9] and even after catching her in a lie about her truck rims, they said they would not arrest her since they were more interested in talking to her. 2-ER-142. For her part, even after being confronted with evidence, Hernandez said she *wanted* to keep talking since she did not "want to be blamed for this.

---

[8] Also, far from denoting real shock, "Oh, my God" is a phrase she uses in any context, no matter how trivial. See, e.g., 2-ER-54 (when asked if she ever tripped a motion sensor at work: "Oh, my God, yeah."); 2-ER-84 (if she ever took work computers home: "Oh, no, no. Oh, my God."); 2-ER-96 (if she had a key to the store safe: "Oh, my God. No, no, no, no.").

[9] They also echoed that sentiment throughout the interview. See, e.g., 2-ER-177 (when Hernandez said she had to use a restroom at one point, Agent Beals replies, "Again, you're free to go, whatever. I mean, like I said— [¶] We appreciate you staying around.").

I want to help you guys." 2-ER-176. And after the interview ended, she *was* actually able to leave. 2-ER-189-91; *United States v. Crawford*, 372 F.3d 1048, 1060 (9th Cir. 2004) (en banc) ("Being aware of the freedom to depart, and in fact departing after questioning . . . , suggest that the questioning was noncustodial.").

Nonetheless, Hernandez claims agents did apply severe pressure by "threatening to prosecute" her 16-year-old daughter. That claim appears throughout her brief but never with a record cite. AOB 1-2, 24, 29, 37, 38. For good reason: agents *never* made that threat. The daughter was eventually discussed (and Hernandez was first to mention her, 2-ER-67), since she was the main driver of a truck seen at the fire, 2-ER-109; surveillance footage tracked that same truck on a round trip to the ORW store from a spot near Hernandez's home at the time of the fire, 2-ER-133-34; and that naturally led agents to opine that a resident of the home—which included the daughter—must have driven the truck to the fire. 2-ER-128, 133. But after Hernandez denied her daughter's involvement, agents never said a word about prosecuting the latter. At most, since she was being questioned at home while Hernandez was being interviewed at the ORW store, agents told Hernandez as much, 2-ER-145; assured her the daughter was fine, *id.* ("She is A-okay."); said Hernandez could call her, 2-ER-177; and stated at interview's end, "You can now drive to your house and see your daughter." 2-ER-189. How any of that amounts to a "threat to prosecute"

39

the daughter is beyond us. (And elsewhere in the interview, agents even complimented the daughter's grades and sports pursuits. 2-ER-116-17.)

In sum, since three *Kim* factors weighed strongly against custody while two weighed minimally at best in favor,[10] competent counsel *could* "think a motion to suppress would have failed." *Premo*, 562 U.S. at 124.[11] There was thus no deficient performance. *Petrocelli v. Baker*, 869 F.3d 710, 723 (9th Cir. 2017) ("A failure to make a motion to suppress that is unlikely to succeed generally [is] not . . . ineffective assistance[.]").

---

[10] And recall, the five *Kim* factors are not even "exhaustive," *Bassignani*, 575 F.3d at 884; so, many other facts negating custody here would *also* have doomed a *Miranda* claim. For one, even after being confronted with evidence, Hernandez had no problem consenting to a search of her home. 2-ER-139 ("Q: Is there anything at your house that would be— A: You're welcome to— Q: Can we search your house? A: Absolutely."). Also, by interview's end, she was calm enough to laugh at a question whether she had a gun in her car. 2-ER-163 ("Oh, stop. You guys are just silly."). Last, since she already spoke to Agent Gistinger four days prior, and was told then "she could terminate the interview" and "leave" at "any time," 5-ER-866, she had no reason to believe the second interview would differ.

[11] Hernandez's claim that her case is controlled by *United States v. Mora-Alcaraz*, 986 F.3d 1151 (9th Cir. 2021), and *Kim*, 292 F.3d 969, also fails. While police asked Mora to meet in public (a mall), he "expected to meet a single officer and was confronted instead by four;" he was separated from his seven-year-old son upon arrival; and as such, this Court easily held he "could not leave," since no parent can "walk away from a public place and leave his young son with strangers." 968 F.3d at 1156-57. While police also questioned Kim in public (her store), she arrived not knowing they were there; several officers were at the door; they let her in but not her husband, and locked the door behind her; and though her bilingual son was present and she mostly spoke Korean, police did not let the two talk. 292 F.3d at 971-72. So, this Court again easily found custody. Be all that as it may, nothing remotely similar to either case occurred here.

> b. Counsel's Failure to Argue That the Statements Were Involuntary Was Also Not Unreasonable

Hernandez also faults counsel for not raising a voluntariness claim. AOB 37-39. But those are *even harder* to prove. She would have had to show that the agents' conduct was so coercive it overbore her "free will," compelling her to make statements she otherwise would not have made. *United States v. Leon Guerrero*, 847 F.2d 1363, 1367 (9th Cir. 1988); see, e.g., *Henry v. Kernan*, 197 F.3d 1021, 1027 (9th Cir. 1999) (confession involuntary where suspect was left "shaken, confused, and . . . crying" by officers' "illegal tactics" and "deception," and his answers were "rambling, disjointed, often unresponsive," and sometimes "incoherent").

Here, such a claim would have been a dead-bang loser. As just noted on the *Miranda* issue, during Hernandez's second ATF interview, agents voiced their appreciation that she agreed to meet; said she did not have to go anywhere that made her uncomfortable; calmed her when she was confronted with evidence; said they would not arrest her when they caught her in a lie; never put her in cuffs or restrained her; let her use a restroom; and assured her that her daughter was fine. Also, Hernandez was subjected to no deception; her answers were always responsive and coherent; her mother is actually a retired police officer, and the two consulted before the interview, 2-ER-47-48; and Hernandez even *praised* agents for their professionalism near the end of the interview. 2-ER-182 ("Q: You don't think we mistreated you at all? A: I think you guys are

41

super, super nice."). Given all that, there was no conceivable basis that the agents somehow overbore Hernandez's free will.

Hernandez argues only that her interview ran two-and-a-half hours; she wasn't *Mirandized*; and she repeats her claim that agents threatened her daughter. AOB 38. But the interview duration was not that notable, *United States v. Haswood*, 350 F.3d 1024, 1028 (9th Cir. 2003) ("Even if we assume the interrogation lasted all day, . . . coercion typically involves far more outrageous conduct."); the mere lack of *Miranda* warnings says nothing to all the facts noted earlier indicating voluntariness; and, again, the claim that agents threatened to prosecute Hernandez's daughter has been manufactured on appeal and has no support in the record.[12]

### c. There Was No Prejudice, Since Even a Winning Motion Would Not Have Affected the Verdicts

Last, even if suppression had been attained, there is still no reasonable probability the verdicts would have differed. *Lowry*, 21 F.3d at 346-47.

---

[12] Hernandez's reliance on *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981), is misplaced. *Tingle* found involuntariness where defendant was told she would not see her two-year-old child "for a long time if she did not cooperate," after which she "began to sob," started "shaking," and confessed. *Id.* at 1334-35. Nothing close occurred here. While Hernandez surely had "maternal" concern after hearing her daughter was also being questioned, AOB 39, that was not police overreach. Agents had cause to question the daughter, since a truck she drove was observed at the scene of an arson. *United States v. McShane*, 462 F.2d 5, 6-7 (9th Cir. 1972) (mere fact that a suspect is "concerned" with the welfare of a loved one also being questioned by police does not prove involuntariness).

42

The only major item of evidence obtained in her second interview was Hernandez's eventual admission to lying about when her truck rims were changed, 2-ER-128-29—the basis of her false statement charge (Count 4). But even absent her admission, she told the lie itself *before* she was confronted with evidence or her daughter was discussed, in reply to an innocuous query when the "last work . . . was done" to the truck. 2-ER-111-13 (her answer: "switched the wheels" a "couple months ago"). That said, even if the court could have been convinced that the interview became custodial or involuntary at some point, there is no plausible way it would have been by 2-ER-111-13. And as long as the claim that the rims were changed a "couple months ago" could still be admitted, prosecutors could still easily prove it to be a lie with the AAA security footage showing the truck with dark rims the day after the fire. 4-ER-833. So, the Count 4 verdict would have been the same. Cf. *Bassignani*, 575 F.3d at 885 n.7.

But even assuming otherwise, the arson (Count 1) and attempted witness tampering (Counts 2 & 3) verdicts definitely would not have differed. The circumstantial proof of guilt for the arson was overwhelming, see pp. 3-14, *supra*; and even in closing argument, the prosecutor only listed Hernandez's "lies to ATF" as the *eleventh* of thirteen items of such evidence. 5-ER-1138-39. Finally, the attempted witness tampering was proven by undisputed WhatsApp messages having absolutely nothing to do with the second ATF interview. SER-43-45.

43

B.      The Court Properly Admitted Testimony That $744,000 Went Missing from the Bank Accounts of ORW, During Hernandez's Tenure as Company Controller, as Motive Evidence for the Arson Under Rule 404(b)

Next, Hernandez claims the court erred by allowing an accountant to testify that—based on a forensic audit after the fire—ORW suffered a $744,000 cash shortfall from January 2015 to March 2019, 4-ER-686-87, when Hernandez was company controller. AOB 46-49. This claim fails.

### 1.      Standard of Review

Admission of other acts evidence is reviewed for abuse of discretion. *United States v. Blitz*, 151 F.3d 1002, 1007 (9th Cir. 1998).

### 2.      Guiding Legal Principles

Other acts can be used to prove "motive." Fed. R. Evid. 404(b)(2); see *United States v. Ruiz*, 167 F.4th 1024, 1035 (9th Cir. 2026) (other acts that "explain *why* the defendant" committed a charged offense comprise "classic motive evidence") (emphasis in original).

### 3.      The Missing $744,000 Fell Squarely Within Rule 404(b) as Probative "Motive" Evidence

By way of background, these facts were undisputed below. Hernandez was ORW's controller from January 2015 to March 2019, 4-ER-641-44; in that role, she was responsible for managing cash deposits from sales at all branch stores into ORW's bank accounts, 4-ER-633, 696; 5-ER-1065; once Botello stated his intent to buy ORW in fall 2018, he was entitled to review ORW's books and records as due diligence for the deal, 4-ER-622; and Hernandez was point person for providing that due diligence. *Id.*

44

As prosecutors argued below, then, the fact that ORW lost $744,000 in cash while Hernandez was company controller was sure to be "uncovered" by Botello—and Hernandez knew as much because she was enmeshed in the due diligence process. 2-ER-26. Further, since that disclosure would clearly be to her detriment (e.g., by exposing her to criminal/civil liability, affecting her future employability), prosecutors argued the missing cash was the reason why she then "panicked;" took a series of steps "to prevent ORW's sale" (sending Botello emails threatening fake lawsuits/walk outs, trying to buy ORW herself); and finally resorted to "burning down" the Kearny Mesa store when she still believed the other steps to tank the sale had failed—even though, unbeknownst to her, those steps had succeeded. 2-ER-26-27. Also, while prosecutors believed Hernandez herself stole the $744,000, they argued the missing cash would still be motive to commit the arson even if *someone else* stole it; for, she could still face unwanted scrutiny (e.g., by authorities or future employers) if it came out that her gross financial mismanagement had allowed the theft to occur. 3-ER-456. ("'I'm the controller of the company. This is on my watch. Either I stole it or somebody else stole it on my watch, but I'm going to get in trouble.'").

The court agreed the missing $744,000 was "classic motive evidence," 1-ER-9, on the second theory: so much cash lost "under her watch" was enough of a detriment to give Hernandez motive for the arson. 3-ER-460 ("[T]here's concrete evidence for the argument that things are a financial

45

mess, there's money that's unaccounted for under her watch, and . . . that could be a motive for the crime.").[13]  And since, for reasons noted in the last paragraph, that ruling was not "illogical, implausible, or without support in inferences" that may be drawn from the record, *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc), it did not abuse the court's discretion—which is "wide" in this context.  *United States v. Johnson*, 132 F.3d 1279, 1282 (9th Cir. 1997).

Hernandez counters that she had no motive to burn a store to cover up the missing cash, since ORW financial records are all "backed up off-site." AOB 47-48 (citing 3-ER-345).  But prosecutors never said the point of the arson was to *destroy* records showing the cash was missing; the point was to end any *scrutiny* of such records, which would happen if the pending sale (and due diligence process) was canceled by something as dramatic as the arson of an ORW store.  See, e.g., 3-ER-527 (government opening: "Defendant . . . finds out [ORW] is going to be sold, and *if* it's sold, *then* the missing $740,000 will be discovered.") (emphases added).  Indeed, it was no secret that ORW had poor recordkeeping, 4-ER-635, 653, 694; and the fact the missing cash had already gone unnoticed for years suggests that any records as they already existed were no threat to Hernandez.

Hernandez also argues she had no motive to torch the store "to protect her job," as she already knew Botello would not retain her if the sale went

---

[13]  The court found there was not enough evidence for prosecutors to argue that Hernandez stole or embezzled the $744,000 herself.  3-ER-459-60.

46

through.  AOB 48 (citing 2-ER-129).  But keeping her current job was *not* the only (or even primary) concern she had from the impending discovery that $740,000 went missing during her many years as ORW's controller. Again, such gross financial mismanagement could easily expose her to criminal/civil liability from ensuing investigations; and it could affect her *future* employability too, which also would reasonably be of value to her.

### 4. The Evidence Did Not Violate Rule 403

In allowing evidence of the missing $744,000, the court also properly found that its probative value was not substantially outweighed by a risk of unfair prejudice.  1-ER-5 ("You [defense counsel] keep telling me it's 'a 403 problem,' but I'm having trouble seeing why.").  As just noted, the evidence had significant probative value on "motive," one of the *expressly approved* purposes for other acts listed in Rule 404(b).

Conversely, nothing in the clinical fact that ORW's books were found to be short $744,000 in cash during a post-fire forensic audit is emotional or graphic, so as to have risked a verdict on grounds besides the evidence. Also, the court instructed prosecutors *not* to argue that the money was missing due to its "theft" or "embezzlement" by Hernandez, 1-ER-11, and they scrupulously complied.  *Id.* ("We've tailored our case to avoid saying 'embezzlement' or that 'Carey Hernandez stole the money.'"); 5-ER-1097 (government closing: arguing that Hernandez had "a big problem" only because $744,000 "had gone missing" on "her watch as controller"—i.e.,

47

she "hadn't done her job," and a completed sale of ORW would bring the "fact that she had failed at her job" to light). Finally, the court gave a limiting instruction that jurors could *only* consider other act evidence "for its bearing, if any, on the question of Defendant's motive and for no other purpose." 5-ER-1088. Thus, there again was no abuse of discretion. Cf. *United States v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995) ("the danger of prejudice must not merely outweigh probative value . . . but substantially outweigh it"); 1-ER-10 (court notes same principle).

Hernandez argues otherwise but to no avail. First, claiming that a prosecutor agreed the evidence was "explosive," she cites out-of-circuit cases holding that "explosive" evidence that does "not bear directly on the cause of action" violates Rule 403. AOB 49 (citing 1-ER-8). But the prosecutor only agreed the missing cash was "'explosive' as a motive," 1-ER-8, which was a reference to its probative value, *not* prejudice; since the evidence went to the motive for the charged arson, it *did* bear directly on that charge; and Hernandez's cases are easily distinguished, as they involved sensational, unrelated conduct. See, e.g., *Gonpo v. Sonam's Stonewalls & Art, LLC*, 41 F.4th 1, 5 (1st Cir. 2022) (in wage claim case, the other act was an accusation of "rape" against plaintiff by his 16-year-old daughter); *United States v. McManaman*, 606 F.2d 919, 926 (10th Cir. 1979) (in drug case, the other act was "planning the murder" of an informant).

48

Next, Hernandez claims the court "repeatedly acknowledged" that the missing $744,000 "was 'so prejudicial.'" AOB 49 (citing 1-ER-10). But the court said "*potentially* so prejudicial," 1-ER-10 (emphasis added); and it was only referring to a potential of prejudice if jurors never heard that Hernandez was responsible for cash reconciliation at ORW. *Id.* But jurors *did* hear such evidence. 4-ER-633, 696; 5-ER-1065.

Last, Hernandez claims the court agreed at one point that no curative instruction could "prevent the jury from suspecting that [she] must have embezzled" the $744,000. AOB 49 (citing 1-ER-10). That too is inaccurate. When the court said that an instruction may not "meaningfully mitigate that prejudice," 1-ER-10, what it was referring to—again—was prejudice that could follow if jurors never heard that the money went missing while Hernandez was responsible for it. *Id.* (stating earlier in same paragraph: "[I]f your theory is 'on her watch,' then I'd like to see how it was 'on her watch.'"); *id.* (later in same paragraph: "I do want to see that foundation on how this happened on her watch and be satisfied as to that before" the jury learns $744,000 went missing). Since jurors heard the evidence the court wanted, then, the court's Rule 403 concern never came to fruition.

### 5. Any Error Was Harmless

But even if error occurred, it did not more probably than not materially affect the verdict, *United States v. Arambula-Ruiz*, 987 F.2d 599, 605 (9th Cir. 1993), because the independent evidence of guilt was overwhelming.

Even without the missing $744,000, other evidence not challenged on appeal showed Hernandez *still* had a strong motive to commit the arson. The fake lawsuit she created to scare off Botello; the fake walk out email she sent to the same end; and her email accusing him of discrimination for not promising she would work for him all showed animus towards him —and a desire to frustrate his purchase of ORW.  See pp. 5-8, *supra*.

Further, in an email weeks before the fire, Hernandez *literally* said, "I am a bitch who can fuck some shit up" and "I will go out with a bang!!" And on the night of the fire, a Toyota 4Runner with dark rims matching one she owned was seen on security footage parking at the Kearny Mesa ORW store *just minutes before* the fire began, and leaving soon after— right as the fire was called in to 911.  Even more footage tracked the same truck on a round trip to the ORW store from a point near Hernandez's home in the same timeframe.  See pp. 7, 13-14, *supra*.  Finally, on the day after the fire, Hernandez suddenly changed the truck's license plates; replaced its rims with light ones; and sent furtive messages to coworkers implying the rims were changed *months* before.  See pp. 14-18, *supra*.

On this record, the guilty verdict on the arson count would clearly have been the same absent the alleged error.

C. Sufficient Evidence Supported the Convictions for
Attempted Witness Tampering

Next, Hernandez challenges the sufficiency of the tampering counts. She does not deny that her actions—sending furtive WhatsApp messages to three different ORW mechanics on March 29, 2019, claiming that her truck rims were already changed to silver ones *before* the fire, which she knew was false, SER-43-45—amounted to attempted witness tampering. Instead, she only makes a technical claim that this conduct was not reasonably likely to be investigated federally. AOB 50-54. We disagree.

1. Standard of Review

Assuming a preserved claim, this Court asks whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

2. This Claim Is Waived

After the government rested at trial, Hernandez moved for acquittal and the court deferred ruling. 5-ER-1038; 6-ER-1232 (04/04/2024 docket: "Defendant's oral rule 29 motion noted for the record."). But the court then *never* ruled; and Hernandez failed to obtain a ruling as the moving party. This claim is thus waived. See, e.g., *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1026 (9th Cir. 2009) (objection is waived if court "never ruled," and the moving party "never requested a ruling").

### 3.   This Claim Fails on Its Merits

Regardless, this claim still fails.

### a.   Guiding Legal Principles

18 U.S.C. § 1512(b)(3) prohibits attempted witness tampering meant to hinder a federal officer.  The mere fact that a federal officer ends up investigating a case is not enough for liability, *United States v. Johnson*, 874 F.3d 1078, 1083 (9th Cir. 2017); but defendant also need not actually know a case will get federal scrutiny.  18 U.S.C. § 1512(g)(2).  Instead, the crime only requires proof of a "reasonable likelihood" that a case will be investigated federally.  *Fowler v. United States*, 563 U.S. 668, 670 (2011). While *Fowler* left it to lower courts to determine how to apply this test, the Supreme Court did hold that a reasonable likelihood does not mean "more likely than not," and it need only be "more than remote, outlandish, or simply hypothetical."  *Id.* at 678.  As this and other courts have held, that is not a high bar.  *Johnson*, 874 F.3d at 1083 (*Fowler* test can be met "without much difficulty"); *United States v. Sheffler*, 125 F.4th 814, 826 (7th Cir. 2025) ("not onerous"); *United States v. Smith*, 723 F.3d 510, 518 (4th Cir. 2013) ("relatively low bar").

The requisite reasonable likelihood can be established in many ways. For example, with proof that there already "was a federal investigation in progress at the time" of the tampering; or, proof that federal officers have an "established" practice of "assisting state and local . . . investigations" of the underlying crime.  *Johnson*, 874 F.3d at 1082, 1083 (cleaned up).

52

That the underlying crime has a significant effect on interstate commerce is another way. See, e.g., *Bruce v. Warden Lewisburg USP*, 868 F.3d 170, 185 (3rd Cir. 2017) ("armed robbery and arson of an interstate business" found reasonably likely to get federal attention).

### b. The Evidence of a Federal Nexus Sufficed

Here, *all* three ways to show a reasonable likelihood of federal scrutiny occurred. First and foremost, prosecutors proved a federal investigation was already underway at the time of the attempted tampering. As noted earlier, an ATF National Response Team was tasked to investigate the ORW fire on the same day as the fire, March 28, 2019; and the person who testified such was team member Agent Hankins, whom prosecutors called as their expert on the fire's origin and causes. 4-ER-750 ("Q: When did you get called out for the ORW fire? A: That alert came the same day as the fire: March 28th."). In turn, Hernandez sent all of her misleading WhatsApp messages on the day *after* the fire, March 29, 2019. 4-ER-708; 5-ER-883, 900-01.[14]

Second, prosecutors also elicited evidence that federal officers do have an established practice of helping local officials investigate these cases. Agent Hankins stated that a National Response Team's entire point is to

---

[14] Hernandez claims a federal investigation was not already in effect since National Response Team members "*deployed to* San Diego on March 29." AOB 53 (emphasis added). But the day they physically arrived does not define when their investigation was officially authorized—which, again, Agent Hankins expressly testified was March 28. 4-ER-750.

respond to "large fires" if locals are "overwhelmed by the scene, the scope, and need more resources." 4-ER-750. And there was no dispute here that local officials did seek the ATF's help the same day as the fire, *id.*, or that the fire was large. Jurors learned that the Kearny Mesa ORW store was a two-story warehouse hundreds of yards long with a salesroom, garage, and corporate office; the blaze was a two-alarm fire needing eight engines and hours to contain; it had two points of origin; and even Agent Hankins repeatedly described it as "large." 4-ER-723, 729, 751, 757, 759-60.

Finally, there also was evidence that this fire did have a significant impact on interstate commerce. Jurors heard that ORW is a multimillion dollar business; it has an online store; many of its suppliers are based out-of-state; and its owner even testified that interstate transactions are a "core" facet of its business. 3-ER-545-46; 4-ER-620-21, 634.

So, viewing all this evidence in a light most favorable to the verdict, it did show a likelihood of federal investigation that was "more than remote, outlandish, or simply hypothetical." *Fowler*, 563 U.S. at 678. Hernandez's claims otherwise fail. While she notes that arson is a "classic state crime" and federal investigation of "local arson is atypical," AOB 52, *commercial* arson of an interstate business is not "local arson" and is often prosecuted federally. C.J.S. *Arson* § 20 (Apr. 2026) ("buildings actively used for a commercial purpose . . . all possess the requisite nexus with interstate commerce, for purposes of the federal arson statute"). While she claims

54

the odds of ATF involvement were remote since a fire must "meet certain criteria and there must be a request for help by local authorities," AOB 53, she *ignores* that both predicates occurred here.[15]  And while she says there was no proof that she "knew" federal officers were already involved, *id.*, her actual knowledge was again not required.  18 U.S.C. § 1512(g)(2).

>    **D.**     The Court Did Not Plainly Err by Somehow Failing
>            to Adequately Explain the 70-Month Sentence

Last, Hernandez faults the adequacy of the court's explanation of the 70-month custodial term.  AOB 54-60.  Her contentions are meritless.

>    **1.**    Standard of Review

This claim is unpreserved.  In pertinent part, Hernandez only objected at sentencing to the court's "failure to *consider* all of the 3553(a) factors," 6-ER-1197 (emphasis added), not the quality of its explanation.  As even she argues on appeal, the two concepts are distinct.  AOB 60.  And as this Court has directed, if defendant "did not object below to the sufficiency of the court's explanation for its sentencing determination, we review only for plain error."  *United States v. Ayala-Nicanor*, 659 F.3d 744, 746-47 (9th Cir. 2011).  Such review requires Hernandez to show an error that is obvious, prejudicial, and adversely impacts the fairness of her sentence. See *United States v. Gomez-Norena*, 908 F.2d 497, 501 (9th Cir. 1990).

---

[15] Hernandez also cites statistics that about 267,000 arsons occur annually, while National Response Teams have only been used about 900 times in their existence.  AOB 53.  But since the former statistic is not broken down into commercial arsons of interstate businesses, it too is inapposite.

      2.     The Court Clearly Explained the Basis for
              Its 10-Month Upward Variance

For the first time on appeal, Hernandez assails the quality of sentence explanation on two bases—first, that the court did not adequately justify the upward 10-month variance from the 60-60 month Guideline range. AOB 55-57. That claim is frivolous. The court made crystal clear that the reason it varied was that Hernandez also asked her *16-year-old daughter* "to lie to law enforcement" about when the rims on the Toyota 4Runner were changed, 6-ER-1192-93, but the Guidelines did not have a "specific offense characteristic" for such conduct. 6-ER-1158. The court actually continued sentencing two weeks to let the parties brief that specific issue, 6-ER-1178; and the parties did just that. SER-78-94.

While the basis of the variance was therefore obvious, Hernandez still nitpicks the record. First, she argues that since the Guideline range was 60-60 months, any term higher was "longer than the Guidelines would deem sufficient but not greater than necessary," and so required more explication. AOB 56. But we know of no authority (Hernandez cites none) providing that Guideline ranges define the sentences that are "sufficient but not greater than necessary." That so-called parsimony principle is codified at 18 U.S.C. § 3553(a), and by its terms is informed by far *more* than just a Guideline range. See 18 U.S.C. § 3553(a)(1)-(7). Further, the court here was also entirely correct that the 60-60 month range did *not* account for enlisting one's child to lie to police. 6-ER-1158.

Next, Hernandez claims that because 70 months was "another 17%" above the 60-month minimum, there needed to be "further justification." AOB 57. But precedent is directly to the contrary. *Gall v. United States*, 552 U.S. 38, 47 (2007) (the "percentage of a departure" doesn't dictate the "justifications required for a specific sentence").

Finally, Hernandez suggests more was required since she "disputed" telling her daughter to specifically lie *to police* about when the rims were changed. AOB 57. Again, not so. Besides the fact the dispute was weak,[16] the court rejected it when it found by a preponderance that Hernandez did tell her daughter to lie to police, 6-ER-1188-89, 1192; Hernandez is *not* now challenging that ruling on appeal; and insofar as the court went to pains to explain that ruling before imposing sentence, 6-ER-1182-89, that actually comprises additional explanation for the upward variance that Hernandez is now demanding.

---

[16] Hernandez claimed that since—on the *fourth* time the topic came up in her second ATF interview—she said she *also* told her daughter to lie about the rims because her husband would be mad at their cost, 2-ER-174, that somehow meant she never told her daughter "to lie to law enforcement." SER-80. But not only was this reason suspect for not being advanced when Hernandez was first asked why she told her daughter to lie, it made no sense: if her husband would be mad at the cost, it would not matter when the rims were changed. Regardless, the court properly found from context that Hernandez *did* ask her daughter to lie to authorities. 6-ER-1188-89. After all, it was obvious Hernandez was pushing the lie that the rims were changed months before the fire to throw agents off her trail once she heard that her truck was seen at the arson. SER-85-86. And the daughter *did*, in fact, repeat the lie that the rims were changed months before the fire to other ATF agents when questioned. SER-13.

3. The Court's Failure to Expressly Address Two
Points in Mitigation Was Not Plain Error

Hernandez also faults the court for not addressing, on the record, her arguments in mitigation as to her health issues in custody and history of community service. AOB 57-60. But once again, there was no plain error.

While a court must consider all arguments in mitigation, AOB 57—and this court did, 6-ER-1199—it is *not* required to address all arguments "on the record." *United States v. Carter*, 560 F.3d 1107, 1119 (9th Cir. 2009). Though it "should normally" try to do so, adequate explanations can be "inferred" from "the record as a whole." *United States v. Carty*, 520 F.3d 984, 992-93 (9th Cir. 2008) (en banc). A failure to give "explicit reasons" for denying an argument in mitigation is also not error, if the argument is "straightforward and uncomplicated." *Id.* at 995.

*Carty* controls here. Hernandez's arguments on her health and community service *were* straightforward and uncomplicated: she was having seizures while in custody (but receiving good medical treatment), and she loved community service. 6-ER-1160-62, 1176-78. But while the former was surely unfortunate and the latter definitely laudable, neither point went to reasons why she committed these offenses (or even had anything to do with the offenses). Also, Hernandez herself said that her health issues were *not* an "important" sentencing concern, 6-ER-1177; and she acknowledged receiving good care in custody. *Id.*; accord 2-ER-285-315.

58

Conversely, the record contained far more aggravating factors. As argued by prosecutors and adopted by the court, they included: the fire's scope; the risks it posed to nearby businesses; the threat it posed to firefighters; the arson's premeditated nature; its perpetration to cover up a large amount of missing money for which Hernandez was responsible; her efforts to conceal her involvement; her enlistment of her 16-year-old daughter to lie for her; and the harm not just to Weisser as ORW's owner, but to employees who lost valuable tools to the fire. See pp. 22-27, *supra*. To that last point, the court heard a compelling impact statement from Weisser, 6-ER-1166-73; whereas Hernandez never once mentioned those harmed by the fire *or* their losses in her allocution.

Thus, the reason why the court never expressly addressed Hernandez's health issues or community service was also obvious and can be inferred from the record: those points in mitigation were manifestly outweighed by the myriad facts in aggravation.

### 4. Hernandez Also Cannot Satisfy the Last Two Prongs of Plain Error Review

Last, there was no prejudice, as Hernandez cannot show a "reasonable probability" of a lower sentence had the court not erred as she alleges. See *United States v. Dallman*, 533 F.3d 755, 761-62 (9th Cir. 2008). Had this issue been raised at the time of sentencing, the court would have just provided more explanation in support of the same rulings. For the same reason, there was no adverse impact to the fairness of the sentence.

59

## CONCLUSION

The judgment should be affirmed.

Respectfully submitted,

ADAM GORDON
  *United States Attorney*

DANIEL E. ZIPP
  *Assistant U.S. Attorney*
  *Chief, Appellate Section*
  *Criminal Division*

S/MARK R. REHE
  *Assistant U.S. Attorney*

JUNE 9, 2026.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 25-1746

I am the attorney or self-represented party.

**This brief contains** | 13,844 | **words, including** | 139 | words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- ⦿ complies with the word limit of Cir. R. 32-1.

- ◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

- ◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

- ◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

- ◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - ☐ it is a joint brief submitted by separately represented parties.
  - ☐ a party or parties are filing a single brief in response to multiple briefs.
  - ☐ a party or parties are filing a single brief in response to a longer joint brief.

- ◯ complies with the length limit designated by court order dated [          ].

- ◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Mark R. Rehe | **Date** | June 9, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*